IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| **In re: HomeBanc Mortgage Corporation, et al.,**<br><br>Debtor. | Bankruptcy Case No. 07-11079-KJC<br>ADV. No. 07-51740 (KJC)<br>BAP No. 13-48 |
| **George L. Miller, Chapter 7 Trustee for the Estate of HomeBanc Corp.,**<br><br>Appellant,<br><br>v.<br><br>**Bear Stearns & Co., Inc., Bear Stearns International Ltd., and Strategic Mortgage Opportunities REIT Inc.,**<br><br>Appellees. | Civil Action No. 13-1064-RGA |

MEMORANDUM OPINION

William J. Burnett, Esq., Flaster Greenberg, P.C., Wilmington, DE; Steven M. Coren, Esq. (argued), Kaufman, Coren & Ress, P.C., Philadelphia, PA; Howard J. Kaufman, Esq., Kaufman, Coren & Ress, P.C., Philadelphia, PA; Andrew J. Belli, Esq., Kaufman, Coren & Ress, P.C., Philadelphia, PA, attorneys for Appellant.

Karen S. Owens, Esq., Ashby & Geddes, P.A., Wilmington, DE; Andrew W. Stern, Esq. (argued), Sidley Austin LLP, New York, NY; James O. Heyworth, Esq., Sidley Austin LLP, New York, NY, attorneys for Appellees.

March 27, 2014

*/s/ Richard G. Andrews*
ANDREWS, U.S. District Judge:

Pending before the Court is an appeal by Appellant George L. Miller (the "Trustee"), the Chapter 7 trustee of HomeBanc Corporation ("HomeBanc"), challenging the Bankruptcy Court's grant of partial summary judgment in favor of Appellees (collectively referred to as "Bear") on January 18, 2013. The Court has had regular briefing, oral argument, and supplemental letters.

## I.  BACKGROUND

The dispute arises in connection with Bear's auction of securities owned by HomeBanc, which Bear contends were held subject to zero purchase price repo agreements. Between October 2005 and August 2007, Bear lent money to HomeBanc in a number of repo transactions made pursuant to a Global Master Repurchase Agreement ("GMRA").[1] Each individual transaction made pursuant to the GMRA was accompanied by a confirmation which identified the purchase date, the purchase price, the repurchase date, and the pricing rate. Between 2005 and 2007 HomeBanc obtained approximately $200 million from Bear through numerous repo transactions.

This litigation involves nine securities, which Bear obtained in three sets of transactions that took place in June 2006, June 2007, and July 2007. Each of the securities was transferred to Bear along with other securities, and the confirmation corresponding to each of the securities showed a purchase price of zero and open repurchase dates.[2] HomeBanc's repos became due on August 7, 2007, at which point Bear offered to extend the repos if HomeBanc reduced its outstanding debt by making a payment of approximately $27 million. HomeBanc did not make the payment. On August 9, 2007, Bear issued formal notices of default. That night, HomeBanc

---

[1] A repurchase agreement, or repo, is a transaction whereby one party transfers a security to another in exchange for funds along with a simultaneous agreement by the transferee to give back the security upon repayment of the funds.
[2] An "open repurchase date" means the security is payable on demand. (D.I. 1-2 at 7).

1

filed chapter 11 bankruptcy petitions. The bankruptcy was later converted to a chapter 7 proceeding.

On the morning of August 10, 2007, Bear distributed auction solicitations, also known as bid lists, for the securities on repo under the GMRA, including the nine disputed securities. The bid lists were sent to approximately 200 investors, with bids due on August 14, 2007. In addition to soliciting outside bids, the Bear repo finance desk also solicited bids from the Bear mortgage trading desk. In order to ensure that Bear affiliates were not at an advantage, any bid from an affiliate was required to be submitted 30 minutes prior to the close of the auction. The repo finance desk received only two bids, an all or nothing bid of $60.5 million from the Bear mortgage trading desk, and a bid of $2.19 million by Tricadia Capital for two individual securities, neither of which is among the nine at issue in this appeal. The securities were sold to the Bear mortgage trading desk.

The Bankruptcy Court held that the zero purchase price repo transactions were repurchase agreements under a "bucket theory." (D.I. 1-2 at 21). In order to qualify as a repo transaction under the Bankruptcy Code, the agreement must be "against the transfer of funds." 11 U.S.C. § 101(47)(A)(i). In order to meet this requirement, the Bankruptcy Court pointed to § 13 of the GMRA, which stated that each transaction entered into under the agreement is:

> in consideration of and in reliance upon the fact that all Transactions hereunder constitute a single business and contractual relationship and are made in consideration of each other[... and] that payments, deliveries and other transfers made by either of [the parties] in respect of any Transaction shall be deemed to have been made in consideration of payments, deliveries and other transfers in respect of any other Transactions hereunder.

(D.I. 1-2 at 20-21). The Bankruptcy Court held that even though individual transactions might have a purchase price of zero, other transactions under the GMRA with purchase prices greater

2

than zero provided consideration in order to satisfy the "transfer of funds" requirement of the Bankruptcy Code. (D.I. 1-2 at 21).

The Bankruptcy Court further held that even if the zero purchase price repo transactions did not qualify under § 101(47)(A)(i), they qualified under § 101(47)(A)(v), the catchall provision. (D.I. 1-2 at 21). The catchall provision defines a subclass of agreements which also qualify as repurchase agreements. These are:

> (v) any security agreement or arrangement or other credit enhancement related to any agreement or transaction referred to in clause (i), (ii), (iii), or (iv), including any guarantee or reimbursement obligation by or to a repo participant or financial participant in connection with any agreement or transaction referred to in any such clause, but not to exceed the damages in connection with any such agreement or transaction, measured in accordance with section 562 of this title[.]

11 U.S.C. § 101(47)(A)(v). The Bankruptcy Court held "that the Securities at Issue, even if not outright repos, clearly are credit enhancements related to [the] GMRA, generally, and the June 2006 Transactions and June 2007 Transactions, specifically. Therefore, the Securities at Issue fall within the plain language of [the catchall provision] and are repurchase agreements under the Bankruptcy Code." (D.I. 1-2 at 22).

After establishing that the zero purchase price repo transactions were repurchase agreements under the Bankruptcy Code, the Bankruptcy Court held that Bear's exercise of its contractual rights to sell the disputed securities was entitled to the safe harbor protection of § 559 of the Bankruptcy Code.[3] (D.I. 1-2 at 25). The Bankruptcy Court then considered whether Bear's auction of the disputed securities complied with the terms of the GMRA and was conducted in good faith.[4] (D.I. 1-2 at 29). Because the GMRA gave discretion to the non-

---

[3] Section 559 prevents a court from staying, avoiding, or otherwise limiting the exercise of the contractual rights of a repo participant. *See* 11 U.S.C. § 559.

[4] The Bankruptcy Court also held that the "commercial reasonableness" standard under Article 9 of the UCC did not apply to the auction. (D.I. 1-2 at 29).

3

defaulting party, the Bankruptcy Court concluded that the only real question was whether there was a disputed issue that the auction had been conducted in good faith, which involved consideration of the timing and manner of the auction in light of the prevailing market conditions. (D.I. 1-2 at 36). The Bankruptcy Court held that there was no disputed fact that the auction was conducted in good faith and in accordance with industry practice, and granted summary judgment for Bear. (D.I. 1-2 at 46).

HomeBanc contends that the Bankruptcy Court erred (1) in concluding as a matter of law that the disputed securities were repurchase agreements under the Bankruptcy Code, (2) in applying a subjective rationality standard to the GMRA's netting provisions, and (3) in concluding that the sale of the disputed securities was not irrational or in bad faith. (D.I. 16 at 2-3).

## II.  LEGAL STANDARD

The Court has jurisdiction to hear an appeal from a final judgment of the Bankruptcy Court pursuant to 28 U.S.C. § 158(a)(1). The Bankruptcy Court's order was a final judgment. (D.I. 1 at 2). In undertaking a review of the issues on appeal, the Court applies a clearly erroneous standard to the Bankruptcy Court's findings of fact and a plenary standard to its legal conclusions. *See Am. Flint Glass Workers Union v. Anchor Resolution Corp.*, 197 F.3d 76, 80 (3d Cir. 1999). With mixed questions of law and fact, the Court must accept the Bankruptcy Court's finding of "historical or narrative facts unless clearly erroneous, but exercise[s] 'plenary review of the trial court's choice and interpretation of legal precepts and its application of those precepts to the historical facts.'" *Mellon Bank, N.A. v. Metro Commc'ns, Inc.*, 945 F.2d 635, 642 (3d Cir. 1991) (citing *Universal Minerals, Inc. v. C.A. Hughes & Co.*, 669 F.2d 98, 101–02 (3d Cir. 1981)). In other words, this Court reviews a decision of the Bankruptcy Court just the same

as the Third Circuit usually reviews judgments of this Court. Should there be an appeal of this decision to the Third Circuit, the standard by which this Court reviews the Bankruptcy Court will be the same standard the Court of Appeals will use.

In reviewing the Bankruptcy Court's decision as to whether to grant or deny summary judgment, the district court's standard of review is plenary. *See Rosen v. Bezner*, 996 F.2d 1527, 1530 n. 2 (3d Cir. 1993). In an adversary proceeding, summary judgment is appropriate if the moving party can "show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56; *Bailey v. United Airlines*, 279 F.3d 194, 198 (3d Cir. 2002). When ruling on a motion for summary judgment, the court must view the evidence in the light most favorable to the non-movant. *See Matsushita Elec. Indus. Co., Ltd. V. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The court must accept the non-movant's version of the facts as true and resolve conflicts in the non-movant's favor. *See Big Apple BMW, Inc. v. BMW of N. Amer., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

The moving party bears the initial burden of demonstrating the absence of genuine issues of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). Once the movant has done so, however, the non-moving party cannot simply rest on its pleadings. *See* Fed.R.Civ.P. 56. A non-moving party "will not be able to withstand a motion for summary judgment merely by making allegations; rather, the party opposing the motion must go beyond its pleading and designate specific facts by use of affidavits, depositions, admissions, or answers to interrogatories showing there is a genuine issue for trial." *In re Ikon Office Solutions, Inc.*, 277 F.3d 658, 666 (3d Cir. 2002).

### III.   DISCUSSION

This appeal presents difficult issues. Although with considerable doubt, I cannot agree with the Bankruptcy Court that the so-called "bucket theory," derived from § 13 of the GMRA, satisfied the "transfer of funds" requirement of § 101 of the Bankruptcy Code. The Bankruptcy Code defines a repurchase agreement as:

> an agreement, including related terms, which provides for the transfer of one or more certificates of deposit, mortgage related securities (as defined in section 3 of the Securities Exchange Act of 1934), mortgage loans, interests in mortgage related securities or mortgage loans, eligible bankers' acceptances, qualified foreign government securities (defined as a security that is a direct obligation of, or that is fully guaranteed by, the central government of a member of the Organization for Economic Cooperation and Development), or securities that are direct obligations of, or that are fully guaranteed by, the United States or any agency of the United States against the transfer of funds by the transferee of such certificates of deposit, eligible bankers' acceptances, securities, mortgage loans, or interests, with a simultaneous agreement by such transferee to transfer to the transferor thereof certificates of deposit, eligible bankers' acceptance, securities, mortgage loans, or interests of the kind described in this clause, at a date certain not later than 1 year after such transfer or on demand, against the transfer of funds[.]

11 U.S.C. § 101(47)(A)(i). It is uncontested that the disputed securities were transferred simultaneously with other securities in what everyone agrees were repo transactions. HomeBanc argues that the disputed securities were nevertheless excepted from being repo transactions because the confirmations showed there was no corresponding transfer of funds allocated to the disputed securities. In my opinion, the language of the statute is broad: a repurchase agreement exists when the agreement "provides for the transfer of one or more ... mortgage related securities ... against the transfer of funds by the transferee ..., with a simultaneous agreement by the transferee to transfer [back the securities in the short term] or on demand, against the transfer of funds."[5] There is no dispute that it was a requirement of the transactions that the disputed

---

[5] The statute is mentioned in *In re American Home Mortgage Holdings, Inc.*, 637 F.3d 246, 248 (3d Cir. 2011). The exact issue in the instant case, however, is unprecedented. (D.I. 23 at 39).

6

securities be transferred to Bear as a necessary part of the transactions. (D.I. 19-1 at 61-62). HomeBanc does offer testimony that there was a single conversation in which a Bear employee told a HomeBanc employee that Bear would be holding the disputed securities "in the vault for you." (D.I. 16 at 10, citing D.I. 19-1 at 59).[6] The conversation, which was also cited by the Bankruptcy Court (D.I. 1-2 at 20 n.65), does not raise any disputed material fact, as it is entirely consistent with the rest of the record that all of the disputed securities were transferred as part of repo packages.

HomeBanc argues that because no part of the funds transferred in the transactions was assigned to the disputed securities, they cannot be transferred back "against the transfer of funds." I agree with the Bankruptcy Court that § 13 of the GMRA makes the zero purchase price repo agreements part of a larger package for which there was consideration. The parties essentially agree that the zero purchase price repos could have been transferred back, however, without being "against the transfer of funds." (D.I. 27 at 1; D.I. 28 at 1). Thus, I do not think they fall within a plain reading of § 101(47)(A)(i).

The Bankruptcy Court held alternatively that the disputed securities qualified as repurchase agreements under § 101(47)(A)'s catchall provision. (D.I. 1-2 at 22-23). This provision encompasses collateral agreements that are secondary to the underlying repo transaction, including:

---

[6] HomeBanc argued in its Opening Brief that it was entitled to summary judgment that the disputed securities were not subject to a repurchase agreement. It did not argue that there were disputed facts. (D.I. 16 at 20-24). It did, without identifying any disputed facts, suggest that if there were any, the grant of summary judgment to Bear should be reversed. (*Id.* at 24). In its Reply Brief, there is explicit argument string-citing pages in the appendices for the proposition that the disputed securities "were delivered to Bear in a custodial capacity for future repo transactions that never took place." (D.I. 21 at 9). It is too late to be string-citing the record in a Reply Brief for an argument that was not made in the Opening Brief. In addition, I do not think extrinsic evidence can be used to contradict the otherwise clear contract and contemporaneous contractual documentation, such as the confirmations. (*See* D.I. 17-1 at 9).

7

>any security agreement or arrangement or other credit enhancement related to any agreement or transaction referred to in clause (i), (ii), (iii), or (iv), including any guarantee or reimbursement obligation by or to a repo participant or financial participant in connection with any agreement or transaction referred to in any such clause, ....

11 U.S.C. § 101(47)(A)(v). It seems to me that the only possible reading of this provision is that it is designed to encompass some sorts of transactions that do not fall neatly within the first four subsections. There is no doubt that the disputed transactions were part and parcel of their undisputed repo transactions. It therefore seems to me that the extra securities were plainly within the umbrella of "credit enhancements." I conclude that the disputed securities were repo agreements within the meaning of § 101(47)(A)(v).

HomeBanc further argues that the Bankruptcy Court erred in deciding that the GMRA gave Bear discretion about how to dispose of the disputed securities, and, further, that, assuming Bear had the discretion, there was a disputed material fact as to whether Bear had exercised the discretion in good faith. The parties agree that the GMRA was governed by English law, and further agree that Article 9 of the Uniform Commercial Code did not apply. (D.I. 16 at 19 ["UCC may not apply to repurchase transactions *per se*"]).

English principles of contract interpretation support the Bankruptcy Court's determination that the GMRA gave the non-defaulting party – Bear – a certain amount of discretion in what to do with the disputed securities once HomeBanc had declared bankruptcy. As I understand the dispute (which is informed by the Bankruptcy Court's discussion of the GMRA, D.I. 1-2 at 31-32), the issue is whether the auction complied with the GMRA. In turn, that depends upon whether the auction process resulted in an amount that meets the GMRA's definition of "net value." Net value is "the amount which, in the reasonable opinion of [Bear], represents [the disputed securities'] fair market value, having regard to such pricing sources and

8

methods (which may include, without limitation, available prices for Securities with similar maturities, . . ) as [Bear] considers appropriate . . . ." (D.I. 17-1 at 19). The Bankruptcy Court construed the "reasonable" language to mean "in good faith." Thus, if there was no disputed fact that the auction process was a good faith attempt by Bear to determine the market value of the disputed securities, it was appropriate for the Bankruptcy Court to grant summary judgment for Bear.

The Bankruptcy Court reached the conclusion against a background of English law. The Bankruptcy Court principally relied upon an English case – *Socimer*—for the proposition that English law recognizes subjective and objective reasonableness. HomeBanc criticizes the reliance on *Socimer* because the decision was after a trial, but the timing of the decision is irrelevant to the legal principle. HomeBanc also criticizes reliance on the case because the contractual language was different. This is true, and was recognized by the Bankruptcy Court. I do not think the Bankruptcy Court relied upon the particular facts of *Socimer* for its conclusion. Instead, it analyzed the language of the GMRA, and decided, correctly I think, that it too had language giving discretion to Bear. Certainly, "as [Bear] considers appropriate" is language giving discretion to Bear. Nevertheless, the word "reasonable" modifying the nature of Bear's opinion must also have meaning. The Bankruptcy Court gave it meaning, treating it as adding a "rationality" requirement. (D.I. 1-2 at 35 n.96). The Bankruptcy Court equated this with good faith.

HomeBanc's final argument[7] is that there is a disputed material fact about Bear's good faith in using the auction process "in a dysfunctional market," where the winning bidder was

---

[7] Logically, it is HomeBanc's final argument, but HomeBanc recognized it as its strongest argument. (D.I. 23 at 6; D.I. 16 [putting it first in the Opening Brief]).

9

Bear, and the disputed securities have proven to have a much greater value than what Bear paid for them. One argument that HomeBanc makes is that Bear's procedures for ensuring that the "trading desk" did not have an unfair advantage were a "fiction." (D.I. 21 at 12). HomeBanc offers precious little to back up that accusation, whereas Bear cites significant evidentiary support to the contrary. (D.I. 18 at 11). A second argument is that the auction was not a rational way of valuing the disputed securities. The Bankruptcy Court concluded that there was no factual dispute on this point, but I do not agree with the Bankruptcy Court. There are two reasons why I think there is a factual dispute. One, the auction process resulted in only one bid that included the disputed securities – Bear's. The Bankruptcy Court held, and I agree, that the sale of the disputed securities to Bear was not *per se* evidence of bad faith. When, however, Bear was the winning bidder because it was the only bidder, I think that is indisputable evidence that the market was not working, or that there was something else wrong with the auction process.[8] I appreciate, as did the Bankruptcy Court, that the time of the auction was in the middle of a financial collapse, and maybe the Court's conclusion eventually would be that in the fairly unique situation that Bear found itself in, it acted in good faith, but I cannot conclude that this is the only conclusion the Court could reach.

HomeBanc also relies upon its expert, Scott Calahan, and his report. (Bkr. Adv. No. 07-51740 (KJC), D.I. 245-25). The Bankruptcy Court rejected Calahan's analysis because he used the wrong "commercial reasonableness" standard. (D.I. 1-2 at 42). I agree that he used the wrong standard, but I do not think that his opinions may be completely disregarded at the

---

[8] If the results of the auction had been that there was one bid but it was from an independent party, that would be a much stronger case for good faith. It is understandable that Bear, having obtained securities it did not want to own, through no fault of its own, might sell them in a volatile market at a fire-sale price, and be found to have acted in good faith. It is not so clear to me that selling them to itself is entirely consistent with why the parties would have agreed in the GMRA to give Bear discretion in valuation in the first place.

10

summary judgment stage. He not only reached his "commercial reasonableness" conclusion, but he also explained why he thought Bear's auction conduct "suffered from a large number of serious flaws." (Bkr. Adv. No. 07-51740 (KJC), D.I. 245-25 at 22). He explained that the auction process was not designed to obtain a competing bid. In particular, the combination of speed of the auction, complexity of the securities at auction, lack of information about the securities at auction, Bear's trading desk's knowledge of the securities, and other factors were such that it was unlikely that there would be a competing bid. (*Id.* at 22-26). Mr. Calahan may have 20-20 hindsight, but I think his opinions, in combination with the fact that Bear ended up with the securities after being the only bidder, do create a disputed factual issue about Bear's good faith.

## IV. CONCLUSION

For the reasons discussed, the Court will affirm the order of the Bankruptcy Court dated January 18, 2013, except in regard to the grant of summary judgment on the issue of whether the auction complied with the GMRA. An appropriate Order will be entered.